EDUCATION-SCHOOL PROPERTY-LEASES: Where education district will use ninety percent of property for educational programs and leases for remaining ten percent are for commercial uses that do not interfere with educational programs, existing leases do not disqualify the purchase of the property by the district. Under these facts, purchasing the property subject to existing leases is a purchase for a valid public purpose if the education district board determines lease terms are in the best interests of the district. Minn. Stat. § 123B.51.

(*correcting citations in Op. Atty Gen. 622a6; cr. 161B-11(Oct. 25, 2023)*)

622a6; cr 161b-11



The Office of
# Minnesota Attorney General Keith Ellison
helping people afford their lives and live with dignity, safety, and respect • www.ag.state.mn.us

November 13, 2023

Christian R. Shafer
Ratwik, Roszak & Maloney, P.A.
444 Cedar Street, Suite 2100
St. Paul, MN 55101

**Re:  Request for Opinion**

Dear Mr. Shafer:

Thank you for your letter of September 21, 2023, which requests an opinion from this Office on whether an education district may purchase a property subject to private commercial leases. You represent the Hiawatha Valley Education District (HVED), an education district created under Minn. Stat. § 123A.15, and request this opinion pursuant to Minn. Stat. § 8.07.

## BACKGROUND

The facts as you present them are that HVED is comprised of twelve-member school districts and two charter schools. HVED provides special education, out-of-school placement options, alternative education programs, and other education-related programs and services to children, particularly children with disabilities.

HVED currently houses its operations at five sites and seeks to consolidate its facilities. The district is in discussion with a mall property at a central location that would be substantially renovated to meet the district's needs. Your letter indicates the mall has sufficient space (approximately 83,000 square feet) and flexibility for current programming and anticipated future expansion opportunities. Having all HVED staff at one location will enhance the safety and security of students given the increased total number of staff near a student at any given time.

HVED will be using at least ninety percent of the property under consideration to house its educational programs. The remaining ten percent of the property is subject to commercial tenant leases of varying duration and terms. At least one lease extends to 2032 but allows either the

tenant or landlord to terminate for any reason based on six-months' notice. The HVED Board of Directors is prepared to adopt a resolution stating the areas of the mall occupied by tenants are not currently needed for school purposes, and tenant operations will not interfere with the district's educational programs. The resolution will also state that the Board may renew a lease only if the lease and tenant occupancy does not interfere with HVED educational programs and the space is not necessary for the same.

## QUESTIONS PRESENTED

1. Is an education district authorized to purchase a mall property subject to private tenant leases if the primary purpose of the purchase is to house educational programs, and if the leased spaces are not necessary for, and the lease does not interfere with, the educational programs taking place on the mall property?

2. Would the purchase of a property subject to existing leases qualify as a purchase for a valid public purpose?

## SUMMARY OF CONCLUSION

Where the education district will use ninety percent of the purchased property for its current and anticipated educational programs and leases for the remaining ten percent are for commercial operations that do not interfere with district educational programs, the existing leases do not disqualify the purchase of the property. Under these facts, purchasing the property subject to existing commercial leases is a purchase for a valid public purpose if the terms of the leases are determined to be in the best interests of the district.

## ANALYSIS

**Authority to Purchase Property Subject to Leases**. Your letter acknowledges that school boards are statutorily authorized to purchase property and lease out property, but it is not readily apparent whether school districts can purchase property subject to an existing lease. You argue that such authority can be implied based on various principles of statutory construction.

First, however, as you note the board of an education district formed under section 123A.15 is governed by laws applicable to independent school districts unless specifically provided otherwise. Minn. Stat. § 123A.17, subd. 4. General powers of independent school districts include both specific powers granted by the Legislature and implied powers. Minn. Stat. § 123B.02, subd. 1.

School boards of independent school districts are authorized to purchase property necessary for school purposes. Minn. Stat. § 123B.51, subd. 1. Recognizing that there may not be an exact match of purchased and necessary space, the Legislature also authorized school districts to:

> lease to any person, business, or organization real property that is not needed for school purposes . . . if the board determines that leasing part of the property does not interfere with the educational programs taking place on the property. The board may charge and collect reasonable consideration for the lease and may determine the terms and conditions of the lease.

Minn. Stat. § 123B.51, subd. 4(a).[1] We are not aware of any specific provision of law otherwise providing for real property purchases or leases by education districts, so conclude that Minn. Stat. § 123B.51 applies to HVED as an education district. *See* Minn. Stat. § 123A.17, subd. 4 (education district governed by laws applicable to independent districts unless specifically provided otherwise).

You argue that the power to purchase real property subject to a lease must be implied to give effect to both the purchase authority and lease out authority of section 123B.51, and to conclude otherwise would lead to an absurd result. *See* Minn. Stat. § 645.17(1) and (2).

We agree that the authority to purchase subject to an existing lease may be fairly implied from subdivisions 1 and 4 of Minn. Stat. § 123B.51 The Legislature clearly authorizes a purchase of property by a school district and separately authorizes the district to lease to a business. The power to purchase subject to a lease is fairly implied from those two express authorizations. *Cf. In re Hubbard*, 778 N.W.2d 313, 321 (Minn. 2010) (holding that while court is reluctant to find implied statutory authority of an administrative agency, agency's authority need not be given a "cramped reading" and enlargement of powers by implication must be "fairly drawn and fairly evident from the agency's objectives and powers expressly given by the legislature." *quoting In re N. States Power Co.*, 414 N.W.2d 383, 387 (Minn. 1987) and *Peoples Natural Gas v. Minn. Pub. Utils. Comm'n*, 369 N.W.2d 530, 534 (Minn. 1985)); *Welsh v. City of Orono,* 355 N.W.2d 117, 120 (Minn. 1984) (implied powers of municipality must be in aid of those powers expressly conferred). Consistent with a finding of implied authority here, we previously determined that a school district could take title to property subject to a reversionary interest in favor of a prior grantee. Op. Atty. Gen. 469-a-15 (Nov. 20, 1969).

To effectuate the legislative intent in subdivision 4 that the board "may determine terms and conditions of the lease," the school district must examine the terms of the existing leases to ensure not only the absence of a conflict with the district's educational uses of the building, but that the terms of the leases are reasonable and that assuming them is in the district's best interests. *See* Op. Atty. Gen. 622a6 (Sept. 25, 1946) (in opinion predating section 123B.51, holding school district may lease property to private corporation upon such terms as board reasonably deems to be for the best interests of the school district). This should be part of the district's due diligence in examining any encumbrance on title before the purchase. After the purchase, in addition to not renewing any lease if the space is needed for educational purposes, HVED should also be prepared

---

[1] A previous version of this statute allowed leases out only to "persons or organizations." Minn. Stat. § 123.36, subd. 10(a)(1988). A 1990 amendment added "business" to the list of permissible lessees. 1990 Minn. Laws ch. 562, art. 8, § 23.

to exercise rights of termination in the existing leases if doing so is in the best interest of the district.

**Public Purpose**. You also ask us to opine whether the described purchase would qualify as one for a valid public purpose. The Minnesota Supreme Court has construed "public purpose" to mean "such an activity as will serve as a benefit to the community as a body and which, at the same time, is directly related to the functions of government." *City of Pipestone v. Madsen*, 178 N.W.2d 594, 599 (1970). As noted in your letter, the applicable caselaw holds that an "incidental" private benefit does not disqualify a transaction as being fundamentally for a valid public purpose. *See Visina v. Freeman*, 89 N.W.2d 635, 643 (Minn. 1958). We agree that the benefit accruing to private commercial lessees who occupy approximately ten percent of school property that is not necessary to the district does not necessarily negate the public purpose.

This office analyzed the public purpose question in an opinion regarding whether a municipal liquor store could extend credit to business customers. Op. Atty. Gen 218-R (Sept. 26, 1978). That was a somewhat analogous situation in that the authority to extend credit was not express in statute. After determining that this authority could be fairly implied from the authority to operate the liquor store, we concluded that credit liquor sales could serve a public purpose because the Legislature had determined that operation of municipal liquor stores serves the public good. However, our opinion cautioned that business practices must comply fully with applicable statutes, and credit could not be extended indiscriminately.

Similarly, the Legislature has determined that leasing out property not needed by school districts is a valid function of a district and serves the public good. *See* Minn. Stat. § 123B.51, subd. 4. Also similar to the extension of credit, leases must not be entered into indiscriminately, however. The terms of each lease must be evaluated carefully to ensure the terms (including duration, rent, allocation of risk, nature of the lessee's use of the property, etc.) are in the district's best interests. Only if that is the case will the leases "serve as a benefit to the community." *Madsen*, 178 N.W.2d at 599. That question is for the district to decide.

Thank you again for your inquiry, and we hope this opinion is helpful to you.

Sincerely,

KEITH ELLISON
Attorney General

Encl: Op. Atty. Gen. 469-a-15 (Nov. 20, 1969)
Op. Atty. Gen. 622a6 (Sept. 25, 1946)
Op. Atty. Gen. 218R (Sept. 26, 1978)

|#5634105-v1

VILLAGES: SALE OF REAL ESTATE: Under facts herein, where real estate was conveyed to village, "its successors and assigns," subject to conditions that name of area remain "American Legion Memorial Park" and that real estate be used "solely and exclusively for recreational, educational or other public purposes," and where said conveyance provided for possibility of reverter upon violation of said conditions, village acquired fee simple determinable interest in such real estate which it could convey, subject to aforementioned conditions, to school district for use as school site. <u>In Re Application of Mareck</u> to Register Title; 257 Minn. 222, 100 N.W.2d 758 (1960); Op. Atty. Gen. 469-A-15 September 10, 1969.

November 20, 1969

469-a-15

Mr. J. D. Murphy
Attorney for the Village of
 Grand Rapids
516 West First Avenue
Grand Rapids, Minnesota  55744

Dear Mr. Murphy:

In your letter to Attorney General Douglas M. Head you submit

substantially the following

## FACTS

Prior to the year 1966 the McVeigh Dunn Post No. 60, American Legion, a corporation organized under the laws of Minnesota (hereinafter referred to as the legion) owned certain real estate in or near the village of Grand Rapids (hereinafter referred to as the village).  The legion leased, upon nominal consideration, a portion of this real estate for a term of 50 years to School District No. 318, Itasca county (hereinafter referred to as the school district) for use as a high school football field.  In 1966 the legion conveyed this real estate, including the aforementioned leased portion, by warranty deed (copy enclosed) to the village for a nominal consideration and subject, among other things, to the described lease.  The warranty deed declares that:

"This conveyance is also made subject to the following conditions and restrictions, to-wit:

1.   The name of the area shall remain "American Legion Memorial Park."

2.   The property shall be used solely and exclusively
     for recreational, educational or other public
     purposes.

Violation of such conditions and restrictions shall
cause the above property and all thereof to revert to the
party of the first part, its successors and assigns."

The habendum clause in the deed runs to the village, "its
successors and assigns."

In 1967 the village, by quit claim deed (copy enclosed)
and for a nominal consideration, conveyed to the school
district the property upon which the aforementioned high
school football field is located.  By this same deed the
village also conveyed to the school district approximately
17 acres of the real estate previously conveyed to the
village by the legion.  The deed declares that said pro-
perty is:

"[T]o be used solely for recreational and
athletic purposes."

This deed was not questioned by any of the local citizens
nor was it challenged by the legion or by any other group.

It should be noted that the entire village, together
with all of the land referred to herein, is within the
boundaries of the school district.  Pursuant to some years
of study by outside experts and certain local advisory
committees, the school district submitted to its voters
a bond proposal for acquiring additional land and erecting
thereon a new high school.  The additional land which is now
proposed to be acquired for this purpose adjoins the 17 acres
previously conveyed to the school district by the village
and is part of the remaining land which the village still
holds under its deed from the legion.  The bond proposal
was favorably acted upon by the voters with the full know-
ledge that the new high school would be built upon the afore-
mentioned property to be acquired from the village.

After the bond issue was voted favorably upon by the
voters, a joint committee, consisting   members of the
village council and the school board, studied the advisability
of the proposed transfer of the land in question from the
village to the school district and in so doing considered

several alternate sites. A copy of the recommendations of this joint committee is enclosed herewith. The joint committee recommended, among other things, that the land in question be conveyed by the village to the school district for a consideration of $150,000.

You ask substantially the following

### QUESTION

Under the facts herein, may the village lawfully convey the described land to the school district for use by the school district as a site for a new high school?

### OPINION

In order to answer your question it is first necessary to identify the nature of the village's interest in the land conveyed to it by the legion pursuant to the 1966 warranty deed. This deed, by its terms, creates an estate in fee simple and provides that such estate shall automatically expire upon the occurrence of a stated event, namely, the violation of the conditions relating to the name of the property and its use. A deed of this kind is generally held to create an estate in fee simple determinable. Restatement of Property, § 44. See Op. Atty. Gen. 469-A-15 September 10, 1969, copy enclosed, which concluded that simila language in a deed from the state of Minnesota to the village of Bayport created such an estate in the village of Bayport. Accordingly, we conclude that the interest of the village in the land conveyed to it by the legion is a fee simple determinable with a possibility of reverter remaining in the legion.

In reaching this conclusion we have considered the possibility

that the deed to the village created a charitable trust [See M.S. 1967 § 501.11(7)] rather than a fee simple determinable. However, the use of the word "assigns" in the habendum clause in the deed is inconsistent with the creation of a charitable trust inalienable by the village. In Re Application of Mareck to Register Title, 257 Minn. 222, 100 N.W.2d 758 (1960). Moreover, an express provision for reverter is a common characteristic of a terminable fee and is often a determinative factor in cases requiring construction. Schaeffer v. Newberry, 235 Minn. 282, 50 N.W.2d 477 (1951). For these reasons, and in view of the absence of any facts indicating either that the legion intended to create a charitable trust or that the village took the property with such an understanding, we have concluded that no charitable trust was created with respect to the property in question. Had a charitable trust been created, the village, as trustee, would not have authority to convey such property unless it obtained approval of the district court as provided by § 501.11(7), supra.

Except as modified by the terms of the limitation creating an estate in fee simple determinable, the owner of such an estate may convey his entire interest to another, but the determinable quality of the estate follows the transfer. Restatement of Property, § 50; Tiffany, Real Property, 3rd Edition, § 220, 28 Am. Jur.2d Estates § 26. Thus, the village may convey its entire interest in the described property to the school district subject to the conditions,

as set forth in the deed to the village, relative to the name of the property and its use (See M.S. 1967 § 465.035 authorizing villages to convey their lands to governmental subdivisions for public use). Except as provided by M.S. 1967 § 500.20, violation of these conditions by the school district would automatically terminate the school district's interest in such property. Restatement of Property, § 50.

Under the facts herein, it is proposed that the village convey the described property to the school district for use by the school district as a site for a new high school. Such a use does not violate the condition in the deed requiring that the property be used "solely and exclusively for recreational, educational or other public pruposes." On the contra.y, such proposed use fulfills this condition. We assume, in the absence of information indicating otherwise, that following any conveyance of this property to the school district, the name of the property will remain "American Legion Memorial Park" as required by the other condition in the deed to the village.

As qualified by the discussion herein, we answer your question in the affirmative.

Very truly yours,

DOUGLAS M. HEAD
Attorney General

DMH:MRG:mcf
Encls.

MICHAEL R. GALLAGHER
Special Assistant
Attorney General

cc:  L. L. Huntley, Esq.
     Atty. for School District No. 318
     Itasca County

EDUCATION: School districts: Property: Lease: School board may lease property not needed for school purposes without being authorized by an election of the voters. MS 1945, § 125.06

September 25, 1946
622-A-6
Printed No. 33, 1946 Report

Mr. Dean M. Schweickhard
Commissioner of Education
State Office Building

Dear Sir:

You have submitted to the Attorney General for his consideration these

## QUESTIONS

1. Can an independent school district lease an unneeded school building and site to a private corporation at a fair rental for use other than school purposes?

2. If the answer to question 1 is "yes", and if the term of the lease is more than three years, must authority to enter into the lease by the school district be granted by the voters of the district at a school election?

## OPINION

When any building of a school district becomes such that the same is "no longer needed for the purposes or use of the municipality, and that by leasing the same a better income would be derived and the burden of taxation lightened", such building may be legally leased. *Anderson v. City of Montevideo*, 137 Minn. 179.

Minnesota Statutes 1945, Section 125.06, provides:

"Subdivision 1. The school board shall have the general charge of the business of the district, the school houses, and of the interests of the schools thereof.

"Subd. 2. When authorized by the voters at a regular meeting or election or at a special meeting or election called for that purpose, it may acquire necessary sites for school houses, or enlargements or additions to existing school house sites, by lease, purchase, or condemnation under the right of eminent domain; erect, lease, or purchase necessary school houses, or additions thereto; erect or purchase garages for district-owned school buses; and sell or exchange school houses or sites and execute deeds of conveyance thereof. . ."

It will be noted that in the above quoted subdivision 2 the authority by the voters is necessary in acquiring sites for school houses or enlargements of or additions to school sites

whether acquisition thereof is by "lease", "purchase", or "eminent domain". The requirement of such authority to lease is not specifically mentioned in the clause "and sell or exchange school houses or sites and execute deeds of conveyance thereof".

If it had been intended that an election should be required to authorize the lease of school sites or schoolhouses, it would appear that the word "lease" would also have been used in the latter connection. The omission thereof, in my opinion, limits the meaning of the words "sell or exchange and execute deeds of conveyance thereof" as used in Subdivision 2 of the above cited section to deeds conveying or exchanging the fee title to the school premises. Such clause does not refer to the leasing thereof.

Under § 125.06, I believe it is immaterial whether the lease is for a period of more than three years. Regardless of its duration, it is still a lease and not a sale or exchange of school property.

There appears to be no statutory provision directly authorizing the leasing of school sites or schoolhouses to a private corporation for business purposes.

However, under the decision of our Supreme Court in the above cited case of Anderson v. City of Montevideo, when a public building is unused and not needed and by leasing the same an income can be derived and the burden of taxation lightened, there is an implied authority for so doing in such circumstances.

The proposed agreement, of course, must be reasonable as to the terms thereof, including the time for which the premises are leased. The reasonableness of the lease must be determined by the school board in the exercise of its own judgment after considering the surrounding facts and circumstances. In the board's sound discretion, without being first authorized to do so by an election of the voters of the school district, it may lease the property in question for such length of time as it determines the property will not be needed for school purposes and upon such terms as it reasonably deems to be for the best interests of the school district.

Any former opinions inconsistent herewith are hereby superseded

Very truly yours

J. A. A. BURNQUIST
Attorney General

INTOXICATING LIQUOR: MUNICIPAL LIQUOR STORES: EXTENDING CREDIT TO COMMERCIAL CUSTOMERS: Local governing bodies of municipal liquor stores have authority to extend limited credit to customers. Minn. Stat. § 340.353 (1976).

September 26, 1978

218-R

Edward B. McMenomy, Esquire
Apple Valley City Attorney
Ken Rose Center
Rosemount, Minnesota 55068

Gentlemen:

In your letter to Attorney General Warren Spannaus you present essentially the following

### FACTS

The City of Apple Valley has maintained a municipal liquor store since 1971, the continued existence of which was re-affirmed by a majority of the voters in a special election held when the City's population exceeded 10,000 people. In its ordinary course of business the municipal liquor store has extended limited credit to two commercial customers by selling them liquor on account and billing them quarterly. The companies are commercial enterprises with no ties to the liquor industry and have contact with the liquor business only as customers.

You then ask the following

### QUESTION

Is the municipal liquor store of the City of Apple Valley allowed to offer merchandise at its liquor store to be purchased on credit by business firms?

### OPINION

We answer your question in the affirmative. In our opinion, extending credit is implicitly authorized in the statute that permits municipalities to establish, own, and operate their own liquor stores, Minn. Stat. § 340.353 (1976).

Statutory cities such as the City of Apple Valley, may take only those actions expressly authorized by statute or fairly implied from an express statutory grant. Mangold Midwest Company v. Village of Richfield, 274 Minn. 347, 357, 143 N.W.2d 813, 820 (1966). However, the authority for a municipal liquor store to extend credit may be implied from Minn. Stat. § 340.353, subd. 1 (1976), the general enabling legislation, which provides in part:

> In any city having a population of not more than 10,000 according to the most recent federal decennial census, the governing body may establish, own, and operate liquor stores for the dispensing of intoxicating liquor either "on-sale" or "off-sale" or both. Such liquor stores may also sell cigars, cigarettes, ice, all forms of tobacco, non-intoxicating malt beverages, and soft drinks at retail, and may offer recorded or live entertainment. 1/

In enacting Minn. Stat. § 340.353, subd. 1 (1976), the Legislature chose not to dictate every aspect of municipal liquor store operations. Instead, the Legislature entrusted each local governing body with a degree of business discretion. As this office has previously stated,

> . . . the law has placed in the governing body of a municipality establishing a municipal liquor store the authority to operate it. Such operation should, of course, be reasonable and in the best interests of the community.

---

1/ Minn. Stat. § 340.353, subd. 2, provides, in part, as follows:

> Any municipality in which an authorized liquor store has been established may continue to operate such municipal liquor store notwithstanding any subsequent change in population; . . .

if the municipality approves the continuation at an election. The Apple Valley municipal liquor store continues to operate by virtue of this provision.

Op. Atty. Gen., 218-R, April 8, 1953. See also, Op. Atty. Gen., 218-R, November 20, 1940.

Implicit in the statutory authorization to "operate" a municipal liquor store is the authorization to extend credit to achieve that purpose.

Extension of credit by a municipal liquor store to customers with sound credit ratings would not violate any provision of Minnesota law. Article 11, § 2 of the Minnesota Constitution does provide that:

> The credit of the state shall not be given
> or loaned in aid of any individual, associa-
> tion or corporation except as hereinafter
> provided.

Municipalities, however, face no comparable per se barrier. Visina v. Freeman, 252 Minn. 177, 89 N.W.2d 635 (1958), Davidson v. County Com'rs. of Ramsey County, 18 Gil. 432, 18 Minn. 482 (1872).

The question of whether to extend credit and the questions attendant upon a decision to allow credit transactions involve the exercise of sound business judgment. Municipal liquor stores are not private enterprises. The business discretion of each local governing body does have limits, for although municipal liquor stores function in part in a proprietary role, they exist primarily for public, governmental purposes. 12 McQuillan, Municipal Corporations, § 36.10. Policies put into practice in municipal liquor stores must comport with the aims of the intoxicating liquor statute. No business practice violative of the statutory

purpose or of any requirement of law can be adopted. Op. Atty. Gen. 218-R, October 31, 1957, at 3.

Of course, municipalities may not extend credit indiscriminately. To extend credit is to risk an expenditure of public funds. Accordingly, extensions of credit, like expenditures, must serve a public purpose. Caster v. Minneapolis, 92 Minn. 84, 99 N.W. 361 (1904).

In our opinion, credit liquor sales may serve such a purpose. In enacting section 340.353, the Legislature determined that operation of municipal liquor stores serves the public good. Credit sales, by accommodating regular customers and channeling business into municipal stores, furthers that purpose. Op. Atty. Gen. 218-R, October 31, 1957, at 2. Compare, Fergus Falls v. Fergus Falls Hotel Co., 80 Minn. 165, 83 N.W. 54 (1900). The fact that private parties--i.e., the particular customers--may also benefit does not compromise the public purpose of the sales. Visina v. Freeman, supra. So long as the extension of credit does not frustrate the purposes of the Intoxicating Liquor Act, a policy of credit sales is implicitly authorized by the statute.

This opinion conflicts with a 1952 opinion which interpreted the predecessor statute to Minn. Stat. § 340.353 (1976) so as to preclude both sales by credit and sales by check. Op. Atty. Gen., 218-R, September 28, 1952. See also Op. Atty. Gen., 218-R, June 6, 1952 (barring a check cashing service to store patrons, because

"[n]o authority is granted"). Those opinions relied on <u>Stabs v.</u>
<u>City of Tower</u>, 229 Minn. 552, 40 N.W.2d 362 (1949), a decision
the Minnesota Supreme Court has since reinterpreted and substantially
limited. <u>Hahn v. City of Ortonville</u>, 238 Minn. 428, 57 N.W.2d 254
(1953). Moreover, both 1952 opinions involved an attempt to
distinguish governmental and propriety functions in the operation
of municipal liquor stores. Op. Atty. Gen. 218-R, October 31,
1957, discussed at length the inappropriateness of applying the
governmental-proprietary function distinction to questions con-
cerning the powers of municipal liquor stores. That opinion stated:

> It cannot be said that the police power or
> rather the power to establish does not carry
> with it all powers incidental to the operation
> of a store after its establishment.

<u>Id.</u> at 2.

The opinions of June 6, 1952, and September 28, 1952, are
thus without support in the statute or in current case law, and
to the extent they conflict with this opinion are overruled.

Sincerely,

WARREN SPANNAUS
Attorney General

MARK M. SUBY
Special Assistant
Attorney General

WS/MMS:dlm